(98 App. Div. 628)

## PECK v. WILL & BAUMER CO.

(Supreme Court, Appellate Division, Fourth Department. November 15, 1904.)

1. SALES—INSPECTION—PLACE—WAIVER—QUESTION FOR JURY.

In an action for breach of a contract for the sale of saponified oil, intended for export by the buyer, evidence *held* to tend to establish a waiver of the buyer's duty to inspect the same on delivery to him in New York, and to authorize inspection by his foreign customers, so as to require submission of case to the jury.

McLennan, P. J., and Stover, J., dissenting.

Appeal from Trial Term, Onondaga County.

Action by Edward M. Peck against the Will & Baumer Company. From a judgment in favor of defendant, plaintiff appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Robert B. Honeyman, for appellant.
Thomas Hogan, for respondent.

SPRING, J. This action, brought by the plaintiff as assignee, is to recover damages for breach of contract to deliver 925 barrels of saponified red oil, being part of a sale of 2,500 barrels. The defendant is a corporation in Syracuse engaged in the manufacture of oil. The plaintiff's assignor, one Elbert, was an exporter of oils, doing business in New York City under the style of Elbert & Gardner. In March, 1901, Elbert purchased of the defendant 2,500 barrels of this red oil, to be delivered along from time to time in New York City. While that was the contract place of delivery, it was expected that the oil would be exported. Prior to June 1st, 1,200 barrels were received by Elbert and shipped to Antwerp. This was rejected by the European customers on the ground that it was not saponified, but distilled, containing an undue percentage of free

acid, making an oil entirely different and of inferior quality. Elbert at once notified the defendant of the rejection. The subsequent history of the negotiations is found in letters and telegrams passing between the parties.

The dismissal of the complaint was upon the ground that the delivery of the oil having been made in New York, as stipulated in the agreement, the inspection must be made there. The position, as an abstract proposition, is certainly tenable; but the conduct of the parties indicates that the defendant acquiesced in the rejection made by the foreign customers, and assumed to indemnify Elbert for the loss sustained by the failure in the kind of oil shipped, and undertook to replace with other complying with the contract.

The 1,200 barrels were in two shipments—one of 300, which, upon rejection, was arranged for by the defendant. The larger portion, of about 900 barrels, caused the controversy between the parties. On May 16, 1901, Elbert wired the defendant that the foreign buyers claimed the oil was inferior and not saponified. The defendant replied the succeeding day, expressing surprise at the information. Elbert met the defendant by appointment at Syracuse, where the subject was discussed. Thereafter, and on the 23d of May, he advised the defendant by letter that he would be able "to compromise on basis of percentage of unsaponifiable matter in the oil." The defendant replied, saying, "hope you will soon be in position to write us fully in regard to the inferior Oil recently sent you." After some correspondence in which the defendant stated it had written to its correspondents abroad, it wrote to Elbert under date of June 5, 1901, as follows:

"In regard to replacing the 900 bbls. you are undoubtedly since in receipt of our letter of yesterday, in which we stated that we can send between 200 and 300 bbls. next week.

"If you will give us shipping instructions, we will endeavor to get out 150 bbls. by the end of this week.

"We hope this will satisfy your customers to make shipments as fast as possible.

"We have not heard from our correspondents in Europe, and it is now doubtful whether we can place this oil elsewhere. We hope therefore you will continue to work on the oil and let us know the best offer you can get."

Under date of June 6th, Elbert wrote to the defendant, after referring to the adjustment of the 300-barrel lot, as follows:

"As for replacing the remaining 900, we have given you yesterday shipping instructions for 310 barrels, since you state that you may be able to ship 200 or 300 bbls. this or next week. Anyway, if you cannot ship the entire 310 bbls. please ship as much as you can. * * * We note from your remarks at the bottom of your letter of June 5th in regard to the sale of the rejected lots in Europe. We will use every effort to dispose of the goods, but would also ask you to kindly do your best at your end."

In reply the defendant wrote the following day:

"We assume that the 310 bbls. for which we last received shipping instructions are intended to replace some of these lots, and we will accordingly bill at 4¼ cts. less 1%.

"100 bbls. will be shipped to-day, and the balance (210 bbls.) will go forward some time next week."

90 N.Y.S.—18

And again, June 10th:

"Enclosed we hand you invoices  *  *  *  for 100 bbls. Saponified Red Oil shipped to your address on Saturday. This lot is to take the place of part of the defective oil sent you in previous shipment."

Under date of June 18th:

"*  *  *  In the meantime if you can dispose of this or if you have any offers, please advise us promptly."

In a letter bearing date June 19th, the defendant, after accepting the adjustment made as to the 300-barrel lot, adds:

"We hope to do better on the 900 bbl. lot. Please advise us if these are all on hand at Antwerp, also charges for ocean freight etc., so we can figure exact cost."

In a letter dated June 21st the defendant inclosed a draft in settlement of the 300-barrel shipment, and adds:

"Under the circumstances we think it advisable to hold the 900 bbls. for a short time, and trust you may be able to effect a more profitable settlement."

In a letter of July 5th the defendant says:

"We have your letter of the 3rd and will pay draft covering the 900 bbls. rejected red oil, with proper documents, giving us possession of the oil. *  *  *  We have offered these lots of oil by cable  *  *  *  so in offering same to your people, please do so 'subject to oil being unsold.'"

On July 8th Elbert wired the defendant that the 900 barrels of rejected oil were held in Antwerp subject to defendant's order if it sends 64,000 francs. The defendant replied the same day:

"Will be in New York to-morrow with funds to cable."

On July 12th the defendant wrote to Elbert:

"Enclosed please find New York draft for $1560.75 in settlement of balance of your invoice as rendered covering 900 bbls. of Red Oil now in Europe."

The defendant closes a long letter to Elbert under date of July 23d with the following:

"We expect however that your friends will cable you such offers as they may get for our acceptance, as we do not feel that, under present conditions this oil should be sacrificed."

On August 20th the defendant, acknowledging receipt of the information of the sale of the 80 barrels of red oil, with the prices, adds:

"We hereby authorize you to instruct your bankers to make draft in our favor for the value of these lots, and trust prompt returns will be made."

Again on the same day:

"We have your letter of the 19th, and we note sale of a portion of the oil now on the other side, at 54¾ francs, a price quite satisfactory, and one which we hope you will succeed in duplicating upon the balance of the oil."

In a letter of August 29th the defendant says:

"The only question now remaining is as to the number of barrels due you for the 900 barrels rejected in previous shipments. We feel that all of the lots which contained close to 2% of unsaponifiable matter, should be accepted as regular deliveries, and that only such lots as contained 3% and upward of unsaponifiable matter should be replaced by us.  *  *  *  You understand

of course, that our taking back the rejected lots leaves your requirements considerably above our producing capacity, and we do not want to be placed in a position where we are asked to do the impossible. We will replace such of the rejected oil as contains an unusual percentage of unsaponifiable matter, but we will need a little more time to do it, since we must do this in addition to filling your orders for June, July and August."

The defendant's factory was burned early in September, and its letters thereafter were in a different vein. Under date of September 21st the following occurs:

"Referring to funds due us for the 900 bbls. Oil sold for our account, we are still without return for any part of this. Will you please let us know why this is? We know of no good reason why these funds should be withheld all this time."

We think the jury might have found from this correspondence that the defendants accepted the rejection of this oil, and undertook to replace it with oil which met the conditions of the sale. It endeavored to obtain the best price obtainable for it, took charge of it, and replaced it in part. The judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

Judgment reversed, and new trial granted, with costs to appellant to abide the event. All concur, except McLENNAN, P. J., and STOVER, J., who dissent.